CHICAGO, INDIANAPOLIS & LOUISVILLE RAILWAY COMPANY v. PRITCHARD, ADMINISTRATOR.

[No. 20,945. Filed December 21, 1906. Rehearing denied May May 1, 1907.]

1. CONTRACTS.—Breach.—Recovery by Third Party.—Railroads. —Furnishing Cars.—A servant engaged in loading his master's car, furnished, under contract, by a railroad company, cannot maintain an action on such contract for the failure of such company to furnish a proper car. p. 403.

2. RAILROADS. — Torts.—Furnishing Unsafe Cars.—Liability to Third Parties.—Inspection.—Railroad companies may be liable in tort to the servants of those to whom they furnish cars, where the cars furnished are unsafe, the primary duty of inspection, however, being on the person in possession. Heaven v. Pender, 11 Q. B. D. 506, approved. p. 403.

3. NEGLIGENCE.—Lessors' Liability to Lessees' Servants.—While the lessee must, in general, respond in damages to his servant for injuries caused by defective ways and works, still the lessor may be liable if he has furnished ways or machinery so imminently defective that an ordinarily prudent man, duly mindful of his duty, should know that such ways or machinery so furnished would possibly not be inspected by the lessee or his servants and would probably result in injury to such servant. Daugherty v. Herzog, 145 Ind. 255, distinguished. p. 407.

4. RAILROADS.—Negligence.—Defective Cars.—Proximate Cause. —The fact that a defective car was in the line of causation of an injury, or that without the railroad company's negligence the injury would not have happened, does not conclusively make either such car or such negligence the proximate cause of such injury. p. 408.

5. NEGLIGENCE. — *Intervening Agent.* — *Proximate Cause.*—The fact that a human agency, though in a degree negligent, intervenes, does not make the efficient cause of an injury a remote cause. p. 408.

6. RAILROADS.—*Furnishing Defective Cars.*—*Injuries to Third Party.*—*Proximate Cause.*—A railroad company, furnishing to a shipper a car with an insecure pocket, to be loaded with poles, is liable to such shipper's servant, where, without knowledge thereof, he assists in loading such poles and is injured by the falling of such poles by reason of such defect. p. 408.

7. SAME.—*Duty to Furnish Proper Cars.*—*Inspection.*—Railroad companies are required to furnish shippers proper cars; and shippers have the right to rely upon the safety of the cars so furnished unless they are obviously defective. p. 409.

8. SAME.—*Shipping Defective Cars.*—*Liability to Servants of Other Roads.*—A railroad company turning over one of its defective cars to another company for transportation may be liable to the servants of the transporting company regardless of the negligence of such company in failing to inspect on receipt thereof. p. 410.

9. NEGLIGENCE.—*Proximate Cause.*—*Question for Jury.*—What is the proximate cause of an injury, where the facts are such that ordinary men might differ thereon, is a question for the jury. p. 410.

10. TRIAL. — *Instructions.* — *Negligence.*—*Proximate Cause.*—In determining the proximate cause of an injury, jurors, after being instructed as to the principles of law applicable to the case, should be instructed to use their judgment as practical men to ascertain whether defendant's delinquency, uninterrupted by any other efficient cause, ought justly to be considered as the controlling cause of the wrong. p. 410.

11. RAILROADS.—*Switches.*—*Keeping Safe.*—*Shippers' Servants.*—Railroad companies owe to the servants of shippers the duty of keeping their loading places in a reasonably safe condition. p. 411.

12. TRIAL.—*Instructions.*—*Too Exclusive.*—An instruction which excludes plaintiff's right of recovery except upon one theory is bad, where he may be legally entitled to recover upon other theories. p. 411.

13. EVIDENCE.—*Inferences.*—*Servant's Right to be Where Killed.*—*Railroads.*—*Jury.*—Where a shipper's servant was pinioned to the main track of a railroad by the falling of poles from the west side of a freight-car which he was helping to load from the east side, and was subsequently killed there by a passenger-train, the jury may properly infer that such servant was on

such side of the car rightfully in the discharge of his duty. p. 411.

14. EVIDENCE.—*Presumptions of Fact.—Keeping within Legal Rights.*—Persons are presumed, in the absence of evidence to the contrary, to act within their legal rights.   p. 412.

15. SAME.—*Presumptions of Fact.—Duty of Courts and Juries.*—Courts, in the absence of evidence to the contrary, should proceed slowly in setting aside presumptions of fact made by a jury.   p. 413.

16. MASTER AND SERVANT.—*Scope of. Employment.—Emergencies.*—Courts will not presume that a servant killed by a railroad company while pinioned on the track by poles which fell from a car which he was helping to load on the sidetrack, was acting outside of the scope of his employment in being on the opposite side of the car from the place of loading.   p. 413. ·

17. NEGLIGENCE. — *Contributory. — Last Clear Chance.—Knowledge.—Question for Jury.*—A railroad company may be liable for killing a man fastened on its track, where persons signaled the engineer to stop his train, though such engineer did not know what the danger ahead was, such question being for the jury.   p. 414.

18. RAILROADS.—*Anticipation of Dangers.—Question for Jury.*—Whether the employes of a railroad company should anticipate danger ahead on its track, is, under all of the circumstances, ordinarily a question for the jury.   p. 416.

19. TRIAL.—*General Verdict.—Legal Effect.*—A general verdict, on a complaint in two paragraphs, is a finding for the successful party on both paragraphs.   p. 417.

20. NEW TRIAL.—*Contrary to Law.—Evidence.—Interrogatories.*—A motion for a new trial because the verdict was contrary to law questions the sufficiency of the evidence to support the verdict; and the answers to the interrogatories to the jury cannot be looked to as an aid in determining such question. p. 417. ·

21. RAILROADS.—*Anticipating Dangers.—Trespassers.—Last Clear Chance.*—Where a man, though technically a trespasser, was pinioned on a railroad track, a railroad company, when apprised beforehand of some danger ahead on the track, may be liable for the injuries caused by its failure to stop.   p. 417.

22. TRIAL.—*Instructions.—Refusal to Give.*—The court does not err where it refuses to give requested instructions which are incorrect statements of the law, as applicable to the evidence in the case.   p. 418.

23. APPEAL.—*What Points Decided.*—The Supreme Court will decide only the points presented in the briefs.   p. 419.

From Clay Circuit Court; *Presley O. Colliver,* Judge.

Action by Walter K. Pritchard, as administrator of the estate of Walter McAvoy, deceased, against the Chicago, Indianapolis & Louisville Railway Company. From a judgment on a verdict for plaintiff for $1,000, defendant appeals. Transferred from Appellate Court (39 Ind. App. 701) under §1337o Burns 1901, Acts 1901, p. 565, §15. *Affirmed.*

*E. C. Field, H. R. Kurrie* and *G. A. Knight,* for appellant.

*S. A. Hays, Coffey & McGregor, C. E. Akers* and *B. F. Watson,* for appellee.

GILLETT, J.—Action for the negligent killing of appellee's decedent. There was a verdict and judgment for appellee. The testimony showed the following facts: One Bridges was engaged in the shipment, over appellant's railroad, from the town of Cloverdale, of elm poles of various sizes. Pursuant to his request, appellant placed a flat-car on its siding, just east of its main track, in said town, for use in making one of said shipments. Decedent was a teamster in the employ of Bridges, being hired by the day, and a short time before the accident he drove up to the east side of the car with a load of poles, and, as it was his duty to do, began helping the other men in the work of loading. There were stakes on the west side of the car to keep the poles from rolling off. When the car was about one-half or two-thirds loaded, some one cried: "Flag the train down there" or "Stop the train." A passenger-train from the south was due, and about that time whistled for the town. When the alarm was given, Bridges and one Akin ran down the track to signal the engineer, while the other men started toward the track to see what was the matter. Decedent and one of his associates went around the north end of the car, and, after passing it, the former took but a step to the south, and, while looking in

VOL. 168—26

that direction, the poles on the north end of the car rolled over on him, owing to the fact that some of the pockets which held the stakes gave way. The poles which fell on decedent did not kill him, but they threw him over on the main track, and he was unable to extricate himself, although aided by his companion. A short time afterwards the train came crashing into the poles, instantly killing decedent. Someone, it afterwards turned out, had observed that a part of the load was leaning towards the main track, and this gave rise to the alarm. The giving of it caused much excitement among the men. Bridges ran some seventy-five feet down the track, but Akin, passing him, succeeded in reaching a point some forty or fifty feet beyond. As the two proceeded they waved their hats to signal the engineer. The engineer answered these signals by two short blasts of the whistle. Bridges testified that he could see the train when it was from one thousand five hundred to two thousand feet away from him, and that the engineer gave the answering signal after the train had run between six hundred and eight hundred feet. There is some confusion in the testimony as to distances, and as to where the train was when the engineer answered the warnings. To a considerable extent the matter is illustrated by photographs, in which is shown the situation of objects to which the witnesses made reference. According to the testimony, there was no apparent effort to check the speed. It was up grade for three-quarters of a mile in approaching Cloverdale from the south, and there was a considerable curve in the track immediately south of said town. The locomotive was working steam as it passed the men who had signaled it. The train was composed of three coaches and a baggage-car. The poles had been down for some moments when the engineer gave the answering signal. An examination of the flat-car, which was subsequently made, disclosed that the pockets gave way because of the absence of nuts on some of the bolts which were used to hold the pockets in

place. Bridges had not examined the car, and the defects could have been perceived only by looking from behind the heavy timber through which the bolts passed.

No objection is urged to the complaint. The first paragraph seems to be predicated, at least principally, on negligence in the furnishing of a defective car, while the remaining paragraph charges negligence in the failure of the engineer to stop the train after he was signaled.

The principal contention of counsel for appellant is that there was no evidence to support the verdict and that the court erred in refusing certain instructions tendered by appellant, to the effect that there was no liability on account of the furnishing of a defective car, as there was no contract relation between appellant and decedent. In view of the refusal of said instructions, it is necessary to determine the validity of the theory of defense relative to the defective car.

It is, of course, clear that in such a case as this there can be no recovery upon the contract, as decedent was not in privity therewith, and, as respects the common-law

1. duty to exercise care, which may grow out of contractual undertakings, as well as other circumstances (*Flint & Walling Mfg. Co.* v. *Beckett* [1906], 167 Ind. 491), it is also evident that in the sale or letting of property to others, some limitation must be put

2. upon the obligation of the vender or hirer to respond to third persons in tort, since the duty of inspection rests, at least primarily, upon the person who possesses or controls the property, and, if some limitation were not put on the responsibility of the vender or lessor, the extent of liability, as was pointed out in *Winterbottom* v. *Wright* (1842), 10 M. & W. 109, might be carried to an absurd length. There may, however, in some circumstances, be a liability to third persons growing out of the furnishing of dangerous property, and it is our task to ascertain whether, in view of the facts relative to the furnishing of the car,

the assumption of said instructions was justifiable, that the act of appellant in that particular did not constitute a tort as against decedent.

No consideration of the authorities relative to this subject would be at all adequate which did not hark back to *Heaven* v. *Pender* (1883), 11 Q. B. D. 503. In that case a dock owner furnished, upon a consideration, a tackle for the painting of a ship, which was moored at its own dock. The plaintiff, who was a workman in the employ of the person who had contracted with the ship owner to paint the ship, was injured by reason of the fact that one of the ropes of the tackle was defective. The majority of the court were of the opinion that the dock owner was liable, on the ground that the plaintiff was injured in a work in which the defendant was interested, since it received compensation for permitting the work to be done at its dock and for furnishing the tackle, and that therefore the plaintiff should be considered as on the premises by invitation. Brett, M. R. (afterwards Lord Esher), was of opinion that the case was one in which a duty should be implied by law, independently of contract. He declared that "whenever one person supplies goods, or machinery, or the like, for the purpose of their being used by another person under such circumstances that every one of ordinary sense would, if he thought, recognize at once that unless he used ordinary care and skill with regard to the condition of the thing supplied or the mode of supplying it, there would be danger of injury to the person or property of him for whose use the thing is supplied, and who is to use it, a duty arises to use ordinary care and skill as to the condition or manner of supplying such thing. And for a neglect of such ordinary care or skill whereby injury happens a legal liability arises to be enforced by an action for negligence. This includes the case of goods, etc., supplied to be used immediately by a particular person or persons or one of a class of persons, where it would be obvious to the person sup-

plying, if he thought that the goods were in all probability to be used at once by such persons before a reasonable opportunity for discovering any defect which might exist, and where the thing supplied would be of such a nature that a neglect of ordinary care or skill as to its condition or the manner of supplying it would probably cause danger to the person or property of the person for whose use it was supplied, and who was about to use it."

In *Elliott* v. *Hall* (1885), 15 Q. B. D. 315, it was held that a colliery owner, who shipped coal by rail, in a car leased by him, to a firm, was liable to a servant of the latter who was injured while unloading the car, owing to the existence of a worn pin, which constituted the fastening of a trap in the bottom of the car. Grove, J., said: "It was clearly part of the contract for the sale of the coal to the plaintiff's employers that it should be conveyed in a truck to the buyers, and it must necessarily have been contemplated that, when it arrived at its destination, the truck would be unloaded by the buyers' servants. I think it is plain that under these circumstances a duty arose on the part of the defendant towards the plaintiff. If vendors of goods forward them to the purchasers, and for that purpose supply a truck or other means of conveyance for the carriage of the goods, and the goods are necessarily to be unloaded from such means of conveyance by the purchasers' servants, it seems to me perfectly clear that there is a duty on the part of the vendors towards those persons who necessarily will have to unload or otherwise deal with the goods to see that the truck or other means of conveyance is in good condition and repair so as not to be dangerous to such persons."

In *Caledonian R. Co.* v. *Mulholland* [1898], A. C. 216, Lord Shand significantly observed that the case before the court did not involve a trap, or an invitation to use a trap, or a noxious instrument.

In *Coughtry* v. *Globe Woolen Co.* (1874), 56 N. Y. 124, 15 Am. Rep. 387, a mill owner was held liable for the negligent killing of a workman in the employ of another, owing to the fall of a scaffold, it appearing that the scaffold was erected by the defendant for the use of the workmen who were engaged under such contractor in performing work for the defendant on its premises. The court, in distinguishing certain earlier cases, said: "This case is entirely different. At the time of the injury the scaffold belonged to the defendant, had been erected by it, was in its possession, and was being used on its premises, with its permission, for the very purpose for which it had been furnished, and by the persons for whose use it had been provided." In the subsequent case of *Devlin* v. *Smith* (1882), 89 N. Y. 470, 42 Am. Rep. 311, a scaffold builder, who had erected a scaffold for the use of a contractor in painting the interior of a dome, was held liable for the death of a servant of the latter, caused by a defect in the scaffold. Importance was attached in this case to the fact that the defect was not obvious, and the court expressed itself as of the opinion, in view of the fact that the defendant had undertaken to erect a first-class scaffold, that the contractor, who was not an expert, was justified in relying upon the judgment of the defendant, without making an examination. In the course of the opinion the court, in referring to the relation which the act of the defendant bore to the injury, said: "A stronger case, where misfortune to third persons not parties to the contract would be a natural and necessary consequence of the builder's negligence, can hardly be supposed, nor is it easy to imagine a more apt illustration of a case where such negligence would be an act imminently dangerous to human life."

In *Roddy* v. *Missouri Pac. R. Co.* (1891), 104 Mo. 234, 15 S. W. 1112, 24 Am. St. 333, 12 L. R. A. 746, it was held that the plaintiff was entitled to go to the jury on the question of the defendant's negligence, it appearing that

the plaintiff, the servant of the owner of a stone-quarry, was injured by the act of the defendant in furnishing a defective car to the quarry owner, and that the defendant had built the side-track on which the car was being used under an arrangement by which the defendant was to furnish cars as they were needed for the transportation of the stone. The basis of liability was placed on the ground that it was a matter of mutual interest and profit to the defendant and the owner of the quarry to provide means for the transportation of the stone to market.

It was held in *Skinn* v. *Reutter* (1903), 135 Mich. 57, 97 N. W. 152, 63 L. R. A. 743, 106 Am. St. 384, that the defendants therein were liable where they had knowingly sold hogs afflicted with a dangerous and infectious disease to a live stock dealer, who, without knowledge of such disease, had placed the hogs in a pen with plaintiff's hogs, which thereby contracted the disease and died.

Mr. Smith, in his work on negligence (Whittaker's Smith, Negligence [2d Am. ed.], *13), seems to approve of the principle enunciated by the Master of the Rolls in *Heaven* v. *Pender, supra,* while Shearman & Redfield characterize his opinion in that case as masterly (1 Shearman & Redfield, Negligence [5th ed.], §116). See, also, 19 Harvard Law Rev., 372. Reading the general propositions which are found in said opinion in connection with the limitations which are found therein, it appears, at least in the main, that the opinion correctly declares the law.

Of course, it is the occupier or controller, rather than the lessor, who in general must respond to third persons for defects in property (*Marney* v. *Scott* [1899], 1 Q. B. 986; Webb's Pollock, Torts, 629), but we are of opinion that the lessor may be liable for their injury by such means where it can be said that the property was imminently dangerous to such persons and the circumstances were such that they should have admonished the lessor that there was such a possibility of failure to dis-

cover and repair the defect that, as an ordinarily prudent man, duly mindful of his duty towards others, he should have been prompted to put the property in proper condition before parting with it. The case of *Daugherty* v. *Herzog* (1896), 145 Ind. 255, 32 L. R. A. 837, 57 Am. St. 204, upon which counsel for appellant rely, is distinguishable from the case at bar, principally for the reason that the two years' possession of the owner of the building, the falling of which gave rise to that action, was sufficient to make the prior negligence of the contractor the remote cause of the accident.

This brings us to the question of proximate cause, viewed with reference to the omission of the shipper to examine the car. It is not enough that the furnishing of a defective car by the company was in the line of causation, or even that without carelessness on its part the accident would not have occurred. It does not follow, however, that the intervention of a responsible human agent, even if that agent was in a degree a negligent one, makes the original act the remote cause. Mr. Sutherland properly observes that "the test is to be found, not in the number of intervening events or agents, but in their character and in the natural and probable connection between the wrong done and the injurious consequence." 1 Sutherland, Damages (3d ed.), §17. The primary act must have such a connection with the wrong that it stands in the relation of cause and effect, so that it can be said that it was the duty of the person committing such act to apprehend that injury might thereby occur to another. In this case the intervening cause was not a supervening cause; there was at the most on the part of the shipper only an omission to stay the injurious consequences of what had already been done. In these circumstances, if it can still be said that it was the duty of the company, in view of the imminence of the danger and the possibility that its dereliction would

be overlooked by the shipper, to apprehend that its act might lead to the injury of a third person and, as an ordinarily prudent person, to guard against it, then, within the modern authorities at least, its act was a proximate cause, since the case would be one in which there was an unbroken connection between the wrong and the injury. *Billman* v. *Indianapolis, etc., R. Co.* (1881), 76 Ind. 166, 40 Am. Rep. 230; *Terre Haute, etc., R. Co.* v. *Buck* (1884), 96 Ind. 346, 49 Am. Rep. 168; 1 Thompson, Negligence (2d ed.), §§52, 54-58, and cases cited. As stated in 1 Shearman & Redfield, Negligence (5th ed.), §34: "If the negligent acts of two or more persons, all being culpable and responsible in law for their acts, do not concur in point of time, and the negligence of one only exposes the injured person to risk of injury in case the other should also be negligent, the liability of the person first in fault will depend upon the question whether the negligent act of the other was one which a man of ordinary experience and sagacity, acquainted with all the circumstances, could reasonably anticipate. If such a person could have anticipated that the intervening act of negligence might, in a natural and ordinary sequence, follow the original act of negligence, the person first in fault is not released from liability by reason of the intervening negligence of another."

Still pursuing the question of proximate cause, it is to be remembered, as between the company and the shipper, that the duty was upon the former to furnish a proper car (*Lake Erie, etc., R. Co.* v. *Holland* [1904], 162 Ind. 406, 63·L. R. A. 948); that a considerable degree of reliance would naturally be placed on this fact (*Devlin* v. *Smith* [1882], 89 N. Y. 470, 42 Am. Rep. 311); that the defects could only have been discovered by a very critical examination, and that the car would be in the possession of a shipper but a brief time. Considering the peril to third persons which the company's act involved, it is evident that the car was an imminently

dangerous thing, in the business for which it was to be used, since it could only be conjectured, if the pockets gave way while it was loaded, at what point along the entire line of transit the poles would fall. There are at least two well-considered cases in which it has been decided that a railroad company, turning a defective car belonging to it over to another company for transit, may properly be charged with negligence on account of an injury to a servant of the latter company, irrespective of the question whether the receiving company was guilty of negligence in failing to examine the car. *Moon* v. *Northern Pac. R. Co.* (1891), 46 Minn. 106, 48 N. W. 679, 24 Am. St. 194; *Pennsylvania R. Co.* v. *Snyder* (1896), 55 Ohio St. 342, 45 N. E. 559, 60 Am. St. 700.

It will be observed that in such a case as this the determination of what was the efficient cause, involving, as it does, subsidiary questions upon which the minds of men of ordinary intelligence might reasonably differ, must become, as the ultimate question of negligence may be, one to be submitted to the jury. *Davis* v. *Mercer Lumber Co.* (1905), 164 Ind. 413; 1 Thompson, Negligence (2d ed.), §§161-164. The matter of proximate cause, while somewhat difficult clearly to put before juries, has in it no element which calls for the scholastic subtlety of the schoolmen. In most cases an application of the doctrine only requires, after instructions concerning such of the general principles as the case involves, that the jurors should apply their every-day judgment, as practical men, to ascertain whether there has been such a delinquency on the part of the defendant, uninterrupted by any supervening cause, that the act or omission ought justly to be held as an efficient cause of the wrong.

It is our opinion that it was competent for the jury to find that appellant, as a lessor, was guilty of a negligent

omission as to decedent, if he was rightfully where he was at the time that he was knocked down by the poles, and a *fortiori,* if he was, appellant's duty to him becomes very clear, since it may be asserted on the ground that, having gone where he did under an implied invitation, appellant directly owed him the duty to exercise ordinary care to keep the premises safe. *Baltimore, etc., R. Co.* v. *Slaughter* (1906), 167 Ind. 330, and cases cited; *Heaven* v. *Pender, supra.*

It is the contention of counsel for appellant that decedent was wrongfully on the west side of the car. The instructions refused, which we are now considering, in terms deny to appellee all right of recovery, on the ground that decedent was not in privity with the original contract. As we have seen, this theory was erroneous if there was any evidence on which the jury might base a conclusion that a duty was owing to decedent at the place in which he was when the poles rolled on him. We may also question whether appellant was entitled, by said instructions, to raise the question of a particular duty in this circuitous way, but, without deciding the latter point, we proceed to a consideration of the inferences which the jury had a right to indulge concerning the act of decedent. It is true that the evidence does not directly disclose why he went to the west side of the car, but it must be remembered that he was a servant, and that obedience is due from such a one. The call to stop the train, wherever it came from, naturally suggested that the danger might have something to do with the car which appellant was helping to load for his master. While it may be that decedent went where he did out of a prompting which was not unmixed with curiosity, yet it is difficult, in view of the circumstances, to resist the conclusion that he was moved by his plain duty to be on hand should the emergency, whatever it was, require. We are of opinion that in the free logic, which we have had occa-

sion to observe that a jury may exercise (*McCarty* v. *State, ex rel.* [1904], 162 Ind. 218), it was competent for the jury to conclude that decedent was moved to go where he did, in part at least, out of a prompting of duty. While juries are not authorized to indulge in mere conjectures, yet it is to be remembered that there would be many a bridgeless chasm in subjective inquiries were courts and juries not authorized to act on probabilities. "Probability," says Locke, "being to supply the defect of our knowledge, and to guide us where that fails, is always conversant about propositions, whereof we have no certainty, but only some inducements to receive them for true," and he first mentions as a ground of presumption "the conformity of anything with our own knowledge, observation, and experience." Locke, Human Understanding, book 4, ch. 15, §4. And see Ram, Facts (4th Am. ed.), 118 *et seq.* Presumptions of fact are but conclusions drawn from particular circumstances, the connection between them and the sought for fact having received such a sanction in experience as to have become recognized as justifying the assumption. 1 Starkie, Evidence (10th Am. ed.), *78; *Sulphen* v. *Cushman* (1864), 35 Ill. 186, 201. While the intention of decedent to go, for some lawful purpose, to the place where he was killed, cannot be said to belong to the recognized presumptions of fact, unless it be upon the theory that it should be presumed that he did not intend to go beyond his legal right (Lawson, Presumptive Ev., 336; *Louisville, etc., R. Co.* v. *Thompson* [1886], 107 Ind. 442, 57 Am. Rep. 120), yet here the tendency of the evidence of the facts which induced his action to prove that he was moved to act as he did by the purpose which, as we have sought to show, would naturally actuate a man in the same circumstances is quite as strong as if the case could be assigned to one of the many established presumptions of facts. The dynamics of evidence of facts to induce a presumption of the existence of

some further fact must depend upon the tendency of the evidence to persuade the judgment. The degrees of persuasion as pointed out in 1 Bentham, Judicial Ev., 71 *et seq.*, are infinite, and in the absence of countervailing evidence judges ought to be slow to interpose their judgment as against the conclusion of the jury, where it can really be said that the facts proved have such a close and natural connection with the fact sought, when judged in the light of experience, as fairly calculated to be persuasive of its existence. The state of facts established in this case is not such as to create a violent presumption of the existence of the fact under inquiry. Such a presumption is said to be equivalent to full proof, but the facts, in our judgment, afford a sufficient basis on which to rest a probable presumption, which, it has been observed, "hath also its due weight." 1 Bentham, Judicial Ev., 96. Besides, appellant does not occupy a very benign attitude in making the defense that decedent was a trespasser, since his trespass, if any, was only technical, and; this being true, and there being evidence on which to found a serious claim that the presumption of right conduct should be drawn, we are of opinion that the case is within what Starkie states is the general rule, "that wherever there is evidence on which a jury has founded a presumption according to the justice of the case, the courts will not grant a new trial." Starkie, Evidence (10th Am. ed.), *754.

Assuming the fact above discussed in appellee's favor, the question arises as to the extent of the right of decedent in the particular circumstances. While it is true that his general work about the car was to assist in loading the logs, yet the master, or one whom he might designate, was authorized to go on the other side of the car for any necessary purpose, and we are of opinion that, in the case of an emergency—one of those occasions which now and then occur in the practical affairs of

life, when it is the business of men, and particularly of servants, to be on hand, leaving inquiry as to the necessity therefor to the future—the courts, dealing with the law as a practical science and applying it to such a case as this, ought not to scale down the servant's duties to the ordinary routine of his work. As was said of the rights of a servant in *Barry* v. *Hannibal, etc., R. Co.* (1888), 98 Mo. 62, 11 S. W. 308, 14 Am. St. 610: "In case of an emergency, he may of his own volition step outside of the line of his usual duties. If the departure be such only as the necessities of the case fairly and reasonably call for, keeping in view the character of the work which the servant had contracted to perform, then such departure will not of itself defeat a recovery for damages in case he is injured."

As it would have been proper for the master to contract with any of his employes to perform any necessary work about the car, so, in an extraordinary situation, which called for the servant to act on his own initiative, it ought not to be for the company to assert that he was a trespasser merely because he was not at the place of his routine employment, the fact being that he was not beyond such limits as the master might direct him to go.

The fifth, sixth, seventh, eighth and fourteenth instructions tendered by appellant related to the conduct of decedent in going where he did, and were to the effect that in the circumstances therein hypothetically stated there should be a verdict for the defendant.

This brings us to the question whether, granting that decedent was technically a trespasser, or was guilty of contributory negligence, his administrator was entitled to a verdict, in the event that the jury should find that the train could and should have been stopped after the engineer observed the signals of Bridges and Akin. By this we refer to the doctrine of last clear chance, under which the negligence of a defendant being the proximate cause, or, as it might be expressed, the supervening

cause, the prior conduct of the other party is regarded merely as a remote cause. See *Indianapolis Traction, etc., Co.* v. *Kidd* (1906), 167 Ind. 402; 1 Street, Foundations of Legal Liability, 155; monographic note to *Bogan* v. *Carolina Cent. R. Co.* (1901), 55 L. R. A. 418. As was said in *Isbell* v. *New York, etc., R. Co.* (1858), 27 Conn. 393, 404, 71 Am. Dec. 78: "A remote fault of one party does not of course dispense with the care in the other. It may even make it more necessary and important, if thereby a calamitous injury can be avoided, or an unavoidable calamity essentially mitigated. Common justice and common humanity, to say nothing of law, demand this; and it is no answer for the neglect of it to say that the complainant was first in the wrong, since inattention and accidents are to a greater or less extent incident to human affairs. Preventive remedies must, therefore, always be proportionate to the case in its particular circumstances—to the imminency of the danger, the evil to be avoided, and the means at hand of avoiding it. And herein is no novel or strange doctrine of the law; it is as old as the moral law itself, and is laid down in the earliest books on jurisprudence."

It is stated in 1 Shearman & Redfield, Negligence (5th ed.), §99, that "the plaintiff should recover, notwithstanding his own negligence exposed him to the risk of injury, if the injury of which he complains was more immediately caused by the omission of the defendant, after having such notice of the plaintiff's danger as would put a prudent man upon his guard, to use ordinary care for the purpose of avoiding such injury. It is not necessary that the defendant should actually know of the danger to which the plaintiff is exposed. It is enough if, having sufficient notice to put a prudent man on the alert, he does not take such precautions as a prudent man would take under similar notice." The following are illustrative cases, holding that a railroad company may be liable for a failure of the engineer to stop after notice of danger, although he did

not at the time know precisely the nature of the danger ahead. *Seaboard, etc., R. Co.* v. *Joyner* (1895), 92 Va. 354, 23 S. E. 773; *Meeks* v. *Southern Pac. R. Co.* (1880), 56 Cal. 513, 38 Am. Rep. 67; *Bullock* v. *Wilmington, etc., R. Co.* (1890), 105 N. C. 180, 10 S. E. 988; *Donahoe* v. *Wabash, etc., R. Co.* (1884), 83 Mo. 543. So far as the act of decedent was concerned, the immediate consequence thereof was that the poles rolled on him; thereafter he ceased to be an actor in the affair. The case does not appear to be one of contemporaneous negligence. As to the conduct of appellant's engineer, the signals of the men who were running down the track meant that there was danger ahead, and, even if he could not appreciate its precise form, it was wholly competent for the jury to conclude that the circumstances called on him to stop, if he could reasonably do so without injury to his train and passengers, and for a negligent failure in that particular the company should be held liable. Doubtless he did not appreciate that a man was beneath the poles, and while in some circumstances the indications of danger may go to the question as to the duty of exercising care, yet here the evidence of some kind of danger which might involve others pressed too hard upon the mind of the engineer to authorize us to say that he was not negligent because he could not appreciate the concrete harm. It is stated by a leading writer that "it is enough if an ordinarily prudent person should be able to see danger or harm of some sort ahead. Harm in the abstract, not harm in the concrete, is the idea." 1 Street, Foundations of Legal Liability, 104. See, also, *Coy* v. *Indianapolis Gas Co.* (1897), 146 Ind. 655, 36 L. R. A. 535; *Donahoe* v. *Wabash, etc., R. Co., supra.* In the latter case, which was somewhat analogous to this in its facts, the court seemed disposed to treat the question as one of law, since it quoted, with apparent approval, the following: " 'Where there is reason to apprehend that the track may not be clear, notwithstanding the right of the company to have it clear,

persons operating a train cannot act upon the presumption that the track is. clear, without being responsible for the consequences.' "

As the verdict was general, we must assume that the jury found for appellee on both paragraphs of the complaint. The question as to whether appellant was entitled to judgment on the interrogatories has not been pressed by its counsel, but it certainly cannot be said that the answers to interrogatories were necessarily in conflict with the verdict to the extent that it was based on the second paragraph of the complaint. In this view, the motion for judgment was properly overruled. The assignment of a ground for a new trial that the evidence was contrary to law only raises a question, at least so far as this court is concerned, of whether the evidence supported the verdict, and we are not authorized in so determining to consider the facts specially found by the jury. *Cleveland, etc., R. Co.* v. *Miller* (1905), 165 Ind. 381. It appears to us that the evidence was sufficient to warrant a finding on each paragraph of the complaint, and as there was no intervening error the judgment must be affirmed. It is so ordered.


## On Petition for Rehearing.

Per Curiam.—The earnestness manifested by counsel for appellant in their brief on petition for rehearing seems to call for a further word on our part in disposing of such petition. The cardinal error of counsel lies in the assumption that if decedent was a technical trespasser the company owed him no duty other than not wilfully to injure him. The circumstances being sufficient to apprise the engineer of a peril ahead, which might involve life or limb, we are of opinion that we correctly held that the mere fact that decedent might have been technically a trespasser was not sufficient to debar a

recovery. 1 Shearman & Redfield, Negligence (5th ed.), §§97-100; 1 Thompson, Negligence (2d ed.), §232. The doctrine of last clear chance was clearly in the case, under the second paragraph of the complaint. *Indianapolis St. R. Co.* v. *Marschke* (1906), 166 Ind. 490; *Indianapolis St. R. Co.* v. *Bolin* (1906), 39 Ind. App. 169.

It is now contended, for the first time in this court, that the first paragraph of the complaint fails to state a cause of action, so far as it attempted to charge negligence in furnishing a defective car, and, arguing from this premise, it is claimed that the effect of the evidence is thereby so circumscribed that we erred in holding that appellee was entitled to recover on that theory, and, for the same reason, that we were in error in holding that the instructions tendered by appellant on that subject were properly refused. In appellant's former brief the question of liability on account of the furnishing of a defective car was argued on broad lines, and without attempting to circumscribe the evidence by the allegations which said paragraph contained. As a consequence, we were not at the pains to consider whether said paragraph could be said to state a cause of action on the sole theory of furnishing a defective car. If it be true, however, that said paragraph does not make out a case of negligence in the furnishing of an imminently dangerous thing, the case upon the evidence is but shifted to the question as to the engineer's negligence. As to the complaint that certain instructions concerning the car were not given pursuant to appellant's request, it may be said that the refusal of each instruction referred to in appellant's points and authorities (*Pittsburgh, etc., R. Co.* v. *Lightheiser* [1907], *post*, 438) can be justified on the ground that the instruction in terms directed that upon a finding of the facts therein hypothetically stated there should be a verdict for the defendant. This entirely left out of view the subsequent negligence of the engineer. Error cannot be predicated upon the refusal

Pittsburgh, etc., R. Co. *v.* Taber—168 Ind. 419.

of an instruction unless it was the duty of the court to give it precisely as tendered. *Knapp* v. *State* (1907), *ante*, 153, and cases cited. The case as presented below may not have been tried on the most clear-cut lines, but since a judgment will not be reversed except for an error which appellant's brief makes manifest, we did not regard ourselves as at liberty to explore the record to the extent that might have been done to work an affirmance, but we passed upon the questions as presented. As was said in *Martin* v. *Martin* (1881), 74 Ind. 207, 210: "We never go beyond the brief of appellant to search the record in quest of errors which have not been pointed out in the brief." Other questions are referred to in the brief of appellant in support of its petition for rehearing, but it appears to us that such of said questions as are material are sufficiently disposed of in the principal opinion.

Petition for rehearing overruled.