HAMMOND LEAD PRODUCTS, INC.,
Appellant (Plaintiff and Counter-Defendant Below),

v.

NORFOLK & WESTERN RAILWAY CO.,
Appellee and Cross-Appellant (Defendant and Counter-Claimant Below).

No. 4–1281A206.

Court of Appeals of Indiana,
Fourth District.

April 27, 1983.

Rehearing Denied Sept. 14, 1983.

Kenneth D. Reed, Hammond, for appellant.

Stephen R. Pennell, Stuart, Branigin, Ricks & Schilling, Lafayette, Peter C. Bomberger, Friedrich, Bomberger, Tweedle & Blackmun, Highland, for appellee and cross-appellant.

MILLER, Judge.

Appellant-plaintiff Hammond Lead Products, Inc. (Shipper) brought this action

against appellee-defendant Norfolk & Western Railway Co. (Carrier) alleging Carrier failed to deliver a load of litharge pursuant to the bill of lading as contracted by the parties. Carrier counterclaimed, alleging Shipper negligently loaded its railroad car, resulting in damage to the car. The trial judge entered judgment against Shipper on its complaint and in favor of Carrier in the amount of $6,691.16. On appeal Shipper claims the judgment is erroneous, maintaining Carrier was negligent as a matter of law in providing Shipper with a defective railroad car. Thus, Shipper maintains carrier negligence not only mandates judgment in its favor on the complaint but also bars recovery on the counterclaim. On cross-appeal, Carrier contends the trial court erred in failing to award prejudgment interest. For the reasons which follow, we reverse. Because of reversal on Shipper's first issue of Carrier negligence, we do not address any other issues.

## FACTS

Pursuant to Ind.Rules of Procedure, Trial Rule 52, the trial court entered special findings of facts, conclusions of law and judgment as follows:

1. Hammond Lead Products, Inc. (Shipper) was at all pertinent times an Indiana corporation with offices and manufacturing plant facilities in Hammond, Indiana. At all pertinent times, Plaintiff was engaged in the business of manufacturing and selling lead chemicals and chemical lead products. One of the products which Shipper manufactured and sold in 1973 was litharge, which was a very dense, dry granulated powder composed primarily of lead, and which weighed between 230 and 250 pounds per cubic foot.

2. The Norfolk and Western Railway Company (Carrier) is a corporation engaged in the business as a common carrier of freight by rail. The Carrier conducts part of its operations in Hammond, Indiana.

3. On or about October 31, 1973, and for some time prior thereto, Shipper and Carrier had established a relationship consisting of arrangements whereby Shipper would ship its manufactured products to various of its customers via railroad cars of the Carrier, employing the Carrier's services as a common carrier by rail since Shipper's plant site and facilities were served by the Carrier, which had established tracks at the Shipper's plant premises.

4. Shipper had six (6) cars especially assigned to it for the hauling of litharge, but none of these cars were available on the date of this shipment. It was then the custom of the Carrier to provide another suitable hopper car for use of the Shipper in this situation.

5. On October 31, 1973, Shipper entered into an agreement denominated 'Straight Bill of Lading—Short Form' with the Carrier. (Said document is further described as No. G5097, Shippers No. 1977, Customer's Order No. 7644–5483). Under the terms of said Agreement, the Carrier agreed to deliver 150,000 pounds of 400Y Litharge (dry) manufactured by Shipper to the consignee, General Electric Company, at the consignee's Bridgeville Plant at Bridgeville, Pennsylvania.

6. The Straight Bill of Lading—Short Form was a form prepared by Shipper. It provided in part:

'Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of Lading, including those on the back thereof, set forth in this classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.'

7. The classification in force at the time of this incident which governed the transportation of the shipment was I.C.C. Uniform Freight Classification 11. Rule 27 § 3

of this classification provided, 'Shippers must comply with carrier's rules regarding safe loading of freight and protection of equipment.'

8. At the time of this incident, the Carrier had adopted AAR Circular No. 42–D as its rules regarding the safe loading of closed cars such as N & W 290088. Rule 1(B)(2) regarding the selection and inspection of cars provided:

'When ordering cars for loading concentrated weights of heavy commodities, shippers have the responsibility of notifying serving carriers of this purpose and of not loading any cars not inspected per Rule 1(B)(1).'

Rule 3(C) provided that if the commodity was to be loaded in the center ten to twenty feet of the car, the load could not exceed fifty percent of the stenciled load limit.

9. On or shortly prior to October 31, 1973, Carrier delivered to Shipper hopper car N & W 290088. This car was 46 feet 8 inches long and contained four compartments for loading. The two end compartments could each hold a load of up to 885 cubic feet. The two center compartments could each hold a load of up to 640 cubic feet. The two center compartments were a total of 15 feet 2 inches in length. The maximum loading capacity of this car was 159,100 pounds. The stenciled load limit was 154,000 pounds.

10. When N & W car 290088 arrived at the Hammond Lead facilities, the car was inspected by employees of Hammond Lead, who discovered that the two end compartments were not suitable for loading because of the presence of some foreign material, the identity of which and quantity are unknown. Although it was customary for employees of Hammond Lead to clean out the compartments of the railroad cars prior to loading, the foreign material in the two end compartments could not be cleaned because the employees of Hammond Lead were unable to open the hopper gates of the two end compartments.

11. These defects in the car could have been detected by the Carrier who had 'car knockers' available who could have inspected the car and repaired the gates before delivery to the Shipper.

12. That the employee of the Shipper, Clyde Scott, was not familiar with the railroad rules but was concerned about damaging the car by loading the entire 150,000 pounds in the two center compartments and called his supervisor, Reid, also unfamiliar with the railroad rules, who told Scott to go ahead and load the center compartments only in order to meet the shipping schedule of Shipper's customer. Said loading did not exceed maximum load limit stenciled on the side of the car and was evenly divided between the two center compartments. After the car had been loaded, the car was sealed with N & W seals 2479449–61 by Hammond Lead.

13. While Shipper had the right to reject defective cars, it had done so in the past only when it was absolutely impossible to load the car. A rejection would require a wait from 1½ hours to 6 days to get a replacement car, and the Shipper could not have met its shipping schedule.

14. Carrier's car number 290088 was picked up by Carrier and transported away on November 1, 1973. Said car broke down while in transit and was set out at the Carrier's yards in Fort Wayne, Indiana. An inspection of the car at the time revealed that the center of the car had buckled. The center sill and side sills were bent and the two center compartments were resting on the rails so that the car could not be moved any further.

15. Shipper was first notified that the car had broken down in transit when Mr. Glen Forney telephoned Mr. W.P. Wilke III, President of Shipper, on November 4, 1973, to advise him of the situation. On November 5, 1973, Shipper was sent a telegram by Mr. Notter advising him that the car was in distress, and requesting disposition of the

contents of the car. This telegram further advised Shipper that the Shipper had violated Rule No. 3 of AAR Circular 42–D, because of the Shipper's having loaded the two-center pockets, leaving the two end pockets empty.

16. Following this notification that the car was in distress, it was mutually agreed between Shipper and the Carrier that Shipper would arrange for a supplemental transport and for the equipment, engineering and supervision necessary to off-load the contents from the hopper car into trucks for redirection to a different consignee at Bluffton, Indiana, while the Carrier would provide the labor and equipment to do the work on the hopper car and trucks necessary to the transfer of the property. It was further understood and agreed that the claims of Shipper against the Carrier would be held in abeyance pending disposition of the property, and that the mutual cooperation of the parties in making the transfer would not be construed as release or waiver of any claims, regardless of which party paid or incurred the costs and expenses of making the transfer.

17. The litharge was removed from Carrier's car 290088 on December 13 and 14, 1973. In making this transfer, Shipper lost 500 pounds of litharge, having a value of One Hundred Dollars ($100.00). In addition to any loss of the product itself, Shipper also incurred a direct actual expense of One Thousand Three Hundred Ninety-two Dollars and Sixty-two Cents ($1,392.62) for labor and equipment of Calumet Construction Corporation to remove the powdered lead material from the damaged car, Five Hundred Fifty-nine Dollars and Thirty-four Cents ($559.34) for labor and expenses of its own employees incurred in transferring the product, and Sixty-two Dollars Twenty-five Cents ($62.25) for long-distance telephone expense, Two Thousand Two Hundred Fifty Dollars ($2,250.00) for company expenses connected with unloading and reshipping to a new customer, for a total of Four Thousand Five Hundred Sixty-five Dollars and Twenty-one Cents ($4,565.21)

18. N & W car 290088 had a fair market value of Eight Thousand Eight Hundred Sixty-six Dollars and Nineteen Cents ($8,866.19) at the time of this incident before it was damaged. Since the cost of repair exceeded the fair market value of the car, the car was sold for scrap to Levin & Sons in Fort Wayne, Indiana, for the sum of Two Thousand One Hundred Seventy-five Dollars ($2,175.00). The net loss sustained by the N & W as a result of the damage to its car was Six Thousand Six Hundred Ninety-one Dollars and Nineteen Cents ($6,691.19).

## CONCLUSIONS OF LAW

1. That the law is with the Defendant and against the Plaintiff on its Complaint;

2. That the law is with the Defendant and against Plaintiff on Defendant's Counterclaim;

3. That the Shipper could have rejected the defective hopper car number 290088 or requested Carrier to repair and clean out the car or deliver a replacement car;

4. The sole proximate cause of the breakdown of hopper car 290088 was the Shipper's improper loading of said car and sealing the hatches on said car so that the improper loading was not observable to Carrier;

5. That no negligence was committed by the Carrier after accepting said car from the Shipper;

6. That Carrier has suffered damages in the sum of Six Thousand Six Hundred Ninety-one Dollars and Sixteen Cents ($16,691.16).

## JUDGMENT

IT IS NOW, THEREFORE, ORDERED, ADJUDGED AND DECREED that the Plaintiff take nothing by its Complaint; and

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Defendant be awarded judgment against

the Plaintiff in the amount of Six Thousand Six Hundred Ninety-one Dollars and Sixteen Cents ($6,691.16);

IT IS FURTHER ORDERED that the costs of this action by paid by the Plaintiff."

## DECISION

■ The nature of common carrier liability which originated in the common law was a strict liability standard which held common carriers to a higher degree of care than other bailees. This theory of strict liability on carriers was held necessary because shippers have no choice but to entrust their goods to the common carriers. Thus, although a carrier does not rise to the level of an insurer, under the common law a carrier could be liable whether it was negligent or not. Mulcahy, *Motor Carrier Cargo Liability—An Overview*, 49 ICC PRACTITIONER'S JOURNAL 257 (1982); *see generally* Skulina, *Liability of a Carrier for Loss and Damage to Interstate Shipments*, 17 CLEV.–MAR.L.R. 251 (1968). Today, "liability of a carrier for damage to an interstate shipment is a matter of federal law controlled by federal statutes and decisions." *Missouri Pacific Railroad Co. v. Elmore & Stahl*, (1964) 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194.

■ Portions of this common law liability were codified in the Carmack Amendment to the Interstate Commerce Act.[1] Under this statute, a carrier is liable for damage to goods transported by it unless it can show the damage was caused by: 1) an act of God; 2) public enemy; 3) public authority; 4) the inherent vice or nature of the goods; or, essential to this case, 5) an act of the shipper. *Missouri Pacific Railroad Co. v. Elmore & Stahl, supra*. Using the Carmack principles, the Supreme Court in *Missouri Pacific* held a carrier has a double burden of proof—after the shipper makes a prima facie case by showing delivery of the shipment to the carrier in good condition, arriv-

al in damaged condition and the amount of damages, the carrier, in order to be free of liability, must prove 1) it was free from negligence and 2) the damage to the cargo was due to one of the five exceptions listed above. In a more recent case this burden of proof is described as akin to res ipsa loquitur because the carrier in possession is the only one in a position to know what actually damaged the shipment in its care. *Kaiser Aluminum & Chemical v. Illinois Central Gulf Rail Co.*, (8th Cir.) 615 F.2d 470, 474, *cert. denied*, (1980) 449 U.S. 890, 101 S.Ct. 249, 66 L.Ed.2d 116.

■ Shipper in our case is asking the court to apply the principle of *Missouri Pacific*, claiming the circumstances are within its rule. However, the facts before us are distinguishable because the alleged negligence of Carrier—delivery of a defective car—occurred *before* Shipper, with knowledge of the inoperable hoppers, loaded the litharge and delivered the loaded car to Carrier. Further, at no time did Shipper contact Carrier about the possible problem. Where, as here, a shipper-carrier controversy involves more factors than covered by federal statutes, common law decisions as well as the statutory principles are utilized by the courts to determine liability. *Gordon H. Mooney, Ltd. v. Farrell Lines Inc.*, (2d Cir.) 616 F.2d 619 *cert. denied* (1980) 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96; *Litvak Meat Co. v. Baker*, (10th Cir.1971) 446 F.2d 329.

■ Recognizing that common law and statutory principles of strict liability apply rather than ordinary negligence standards, we turn to analyze our case. The trial court found Carrier and Shipper had a longtime relationship and Carrier was fully familiar with the products sent by Shipper. Carrier knew what type of vehicle would be needed by Shipper. In fact, Carrier had six cars specially designated for Shipper's use. Shipper had made a timely request for a car to haul 150,000 pounds of litharge. Carrier

---

1. Effective Oct. 17, 1978, this statute was recodified by Pub.L. No. 95–473, 92 Stat. 1337, 1453–54, and now appears at 49 U.S.C. § 11707. For an explanation of the Carmack Amendment see *Adams Express Co. v. Croninger*, (1913) 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314.

had the bill of lading for this shipment before spotting its car to Shipper. When a common carrier has contracted to carry a particular type of goods, there is a duty to provide suitable cars for safe carriage. *A.J. Tebbe & Sons Co. v. Brown Express,* (1960) 161 Tex. 456, 341 S.W.2d 642, 647; 13 AM. JUR.2d *Carriers* § 168 (1964). In Indiana, there is a statutory duty on the carrier to supply a suitable car.[2] The Indiana Supreme Court has stated in this regard that "[t]he duty to furnish a proper car rests upon the carrier and not upon the shipper; and the failure to discharge this duty is negligence, from the consequences of which the carrier is not permitted to free itself by contract or otherwise." *Lake E. & W.R. Co. v. Holland,* (1903) 162 Ind. 406, 413–14, 69 N.E. 138, 141; *see also Chicago, Indianapolis & Louisville Railway Co. v. Pritchard,* (1906) 168 Ind. 398, 79 N.E. 508. Therefore, Carrier here had a duty to provide a car to Shipper which could be loaded with 150,000 pounds of litharge for carriage.

■ We find our decision in this case must be guided by authorities which hold the carrier is not relieved of liability imposed by furnishing a defective car, even though the shipper knew the car was defective when the shipper loaded. *Railroad Co. v. Pratt,* (1875) 89 U.S. (22 Wall.) 123, 22 L.Ed. 827; *Federated Dep't. Stores, Inc. v. Brinke,* (5th Cir.1971) 450 F.2d 1223; *Saint Louis I.M. & S.R. Co. v. Marshall,* (1905) 74 Ark. 597, 86 S.W. 802; *F.D. Forester & Co. v. Southern Ry. Co.,* (1908) 147 N.C. 553, 61 S.E. 524; *A.J. Tebbe & Sons v. Brown Express, supra.* 13 AM.JUR.2d *Carriers* § 173 (1964). In *Pratt,* the shipper, a horse dealer, had been using the railroad for 20 years. On this occasion, the car which was furnished was broken and exposed. Pratt repaired the car as best he could—there was a conflict in testimony as to whether another car was available—and loaded his horses in the car with some hay. Due to the exposed portions of the car some sparks from the locomotive ignited the hay and set fire to the car. Although the railroad had a rule against putting hay in the car and although Pratt knew of the defective condition of the car and voluntarily made use of it, the Supreme Court awarded damages to the shipper and set forth the duty of a carrier to furnish suitable cars. In doing so, the Court adopted the following statement of the trial judge:

> [I]t was the duty of the carrier to furnish suitable vehicles for transportation; that if he furnished unfit or unsafe vehicles he is not exempt from responsibility by the fact that the shipper knew them to be defective and used them; that nothing less than a direct agreement by the shipper to assume the risk would have that effect.

*Railroad Co. v. Pratt, supra* 89 U.S., at 133.

We note the *Pratt* rule has been restricted when the shipper could have obtained a suitable replacement car in time to meet his schedule. *Seneker v. Lusk,* (Mo.App.1916) 190 S.W. 96; *Nicholson v. St. Louis & S.F.R. Co.,* (1910) 141 Mo.App. 199, 124 S.W. 573. However, if another suitable vehicle cannot be supplied in time to meet the shipper's schedule, he is not liable for using the defective car. *A.J. Tebbe & Sons Co. v. Brown Express, supra.*

Here, it was established Carrier furnished a defective car.[3] The trial court findings,

**2.** Ind.Code 8–3–2–5 provides: "Every carrier subject to the provisions of this act [8–3–2–1—8–3–2–16] shall furnish to all parties who may apply therefor, as provided in this act, suitable cars for the transportation of all kinds of freight in car-load lots."

**3.** Carrier claims Shipper violated Rule 3(C) of American Association of Railroads Circular 42–D which rule Carrier had adopted. The evidence was undisputed that Shipper, contrary to the rule, loaded more than 50% of the maximum limit for the car in the center two compartments. However, Shipper did not ex-ceed the maximum limit for the car which was stenciled on its side. Significantly, the trial court made no finding on whether the AAR rules were a part of the ICC tariff nor did it make a conclusion as to whether these rules were imposed on the Shipper. But we need not reach that issue because it appears to us, under the authority of *Pratt,* where the carrier had a rule prohibiting the loading of hay in its car, violation of a railroad rule by a shipper does not relieve a carrier of liability when furnishing a defective car. On the other hand, we note another AAR rule (64(a)) which the Fourth

supported by ample evidence, revealed: 1) the hopper car had an unknown quantity of foreign material in the two end compartments, which material could not be removed by cleaning as Shipper could not open the hopper gates; 2) Carrier could have detected this defective condition if it had inspected the car; and 3) Shipper could not make its shipping schedule if it rejected the car. Since the existence of a defective car and an inability to meet the shipping schedule were established, we must conclude, under the authority of *Pratt* and *Tebbe,* that the trial court judgment was contrary to law.

Reversed and remanded.

YOUNG, P.J., and CONOVER, J., concur.

## ON PETITION FOR REHEARING

Norfolk and Western Railway Company (Carrier) requests that we reconsider our ruling in this cause and that we give a statement in writing on the questions pertaining to Carrier's counterclaim. Originally, Hammond Lead Products, Inc. (Shipper) had filed an action for damages resulting from Carrier's failure to deliver a load of litharge while Carrier counterclaimed for damages to its railroad car. After a bench trial, the trial court found for the Carrier and against the Shipper on both the complaint and the counterclaim. On appeal, we reversed both judgments because the Carrier had furnished a defective car which could not be properly loaded with the litharge. We do not grant rehearing, but we will attempt to clarify our reasons for reversal on the Carrier's counterclaim for damages to its railroad car.*

In our original decision, we concluded that under *Railroad Co. v. Pratt,* (1875) 89 U.S. (22 Wall.) 123, 22 L.Ed. 827, a carrier is not relieved of his liability imposed by furnishing a defective car even though the shipper knew the car was defective when the shipper loaded. In *Pratt,* the shipper not only loaded his horses knowing the car was defective, but he also improperly put hay, a fire hazard, in the defective car which hay was then ignited by sparks from the locomotive. However, in *Pratt,* the carrier did not counterclaim for the destruction of the railroad car.

In this case Shipper ordered a railroad car capable of transporting 150,000 pounds of litharge. Carrier provided a car, presumably to be used, which had a stenciled weight limit of 154,000 pounds but the two outside hoppers of the car were inoperable. Shipper then loaded the litharge in the remaining two center hoppers which was the only way to utilize the railroad car and meet the Shipper's schedule. The improper loading and the ensuing breakdown was a direct result of the defect in the

Circuit Court of Appeals found binding on a carrier and renders a carrier furnishing defective cars responsible for the entire loss. The rule provides:

> " 'Car shall be inspected while empty and before each loading by carrier furnishing the equipment and, if necessary, properly cleaned and placed in good condition so that loss of or damage to freight may not result from defects in car, filth, waste, oil, grease or other substance or from anything liable to cause loss of or damage to freight; such inspection to be governed by the kind of freight to be loaded and the probability of loss or damage.... Carrier furnishing the equipment shall keep a permanent record showing where car was inspected, name of person making the inspection, condition of car, and extent of inspection at time of such inspection.
>
> When the physical facts developed by inspection at destination or enroute prove beyond a reasonable doubt that car was furnished in a defective, unclean, or otherwise unfit condition to transport the commodity without loss or damage, such facts shall render the origin or carrier furnishing the equipment responsible for the entire loss.' "

*Millers Mut. Ins. Ass'n of Illinois v. Southern Ry. Corp.,* (4th Cir.1973) 483 F.2d 1044, 1053.

* Carrier does not cite us to any cases which established liability on a shipper when a carrier furnished a defective car. Carrier in his argument did cite one case. *Southern Pacific Transportation Co. v. United States,* (E.D.Cal. 1978) 456 F.Supp. 931. However, in that case the court deliberately limited the holding to establishing a shipper had the burden of proof as to a carrier's contributory negligence in a suit for damages to carrier's property. The court expressly stated that it did not address the issue of the effect of a finding of contributory negligence on the right of the carrier to recovery.

railroad car which defect Carrier could have detected if it had inspected the car.

In *Pratt,* the Court relieved the shipper of his negligence for improperly loading a defective car in the only way it could be utilized for the purpose for which it was furnished. Since a shipper is relieved of his negligence in this situation, we find it inappropriate to assess a shipper for damages to the defective railroad car. We note that because of the defect in the car, Shipper loaded in the only way possible, and the ensuing breakdown was a direct result of the defect. We do not hold that negligence and damage to a railroad which are unrelated to the defect in the car furnished will relieve the shipper of his liability. But under the facts of this case, we hold Shipper is not liable for the damages to Carrier's defective car.

Rehearing denied.

CONOVER, P.J., and YOUNG, J., concur.